Mark L. BURLEY and Allyne R. Burley, Plaintiffs,

v.

HOMEOWNERS WARRANTY CORPORATION and CIGNA Insurance Company (Formerly Known as INA Underwriters Insurance Company), Defendants.

Earl T. YEOMANS and Patricia A. Yeomans, Plaintiffs,

v.

HOMEOWNERS WARRANTY CORPORATION and CIGNA Insurance Company (Formerly Known as INA Underwriters Insurance Company), Defendants.

Cleo WATKINS, Plaintiff,

v.

HOMEOWNERS WARRANTY CORPORATION and CIGNA Insurance Company (Formerly Known as INA Underwriters Insurance Company), Defendants.

Civ. A. Nos. J88–0317(L), J88–0318(W) and J88–0334(B).

United States District Court, S.D. Mississippi, Jackson Division.

Feb. 9, 1990.

John M. Mooney, Jr., McAllister & Mooney, Jackson, Miss., for plaintiffs.

Robert A. Miller, Watkins & Eager, Jackson, Miss., for defendants.

## AMENDED MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant Home Owners Warranty Corporation (HOW) for summary judgment and the motion of defendant Cigna Insurance Company (CIGNA) for partial summary judgment on the complaints filed

by plaintiffs Mark E. and Allyne Burley and Earl T. and Patricia A. Yeomans, for summary judgment on the complaint of Cleo Watkins, and for partial judgment on the pleadings. Plaintiffs have responded to defendants' motions and in deciding the matters raised in the motions, the court has considered the memoranda of authorities together with attachments submitted by the parties.

Plaintiffs in these cases are homeowners who have brought suit against HOW and against CIGNA seeking to recover proceeds allegedly due under a major construction defect insurance policy issued pursuant to the Home Owners Warranty program and insuring their respective residences. Prior to addressing the facts presented in the cases at bar, and in an effort to understand the context in which these cases have arisen, it is helpful to consider the nature and function of the Home Owners Warranty Program (HOW Program) in the home building and home buying industry. An overview of the program is provided in *The Home Owners Warranty Program: An Initial Analysis*, 28 Stan.L.Rev. 357 (Jan. 1976):

> Prompted in part by fear of federal preemption in the homeowner protection field and by a purported subscription to the belief that "good consumerism means good business," the Board of Directors of the (National Association of Home Builders) NAHB, whose members construct about one-half of all new houses in the United States adopted the Home Owners Warranty Program. Participating builders must register with HOW and agree to observe HOW's approved construction and performance standards. The Home Owners Warranty Corporation, a wholly owned subsidiary of the NAHB,[1] administers the program, licenses and monitors the performance of local warranty councils, and maintains a registry of the participating builders. These local councils register the local participating builders, enroll new units, adopt local

1. HOW remained a wholly-owned subsidiary of NAHB until 1981 when it became owned by its

participating builders on a mutual basis.

builder performance and building quality standards, monitor local inspection procedures, and arrange for conciliation and arbitration of claims. . . .

A HOW-registered builder contracts with home buyers to cover faulty workmanship and defective materials, as well as major construction defects during the first year. Additionally, during the first 2 years the builder guarantees plumbing, heating, electrical, and cooling systems and repair of major construction defects. During the third through tenth years of the warranty, the unit is protected against major construction defects through private insurance coverage arranged by HOW. . . .

To cover the expenses of the program, a one-time fee of $2 per $1,000 of the closing price is charged and is presumably incorporated into the cost of the unit. One-half of this amount is used to pay for the insurance premium; the other half is earmarked for administration and promotion of the program by the national and local councils.

*Id.* at 358–62 (footnotes omitted).

The facts giving rise to each of the plaintiffs' claims will be separately addressed.

## FACTS

### BURLEY

In July 1980, Mark and Allyne Burley purchased their home in Jackson, Mississippi. In connection with their purchase of the home, the Burleys were provided the warranty and insurance of the HOW program; the effective date of their warranty was July 20, 1980. On November 5, 1986, during the seventh year of coverage, the Burleys notified HOW, by letter, of their claim that their home had a major construction defect. By letter dated November 20, 1986, HOW referred the claim to CIGNA. On December 1, CIGNA received notice that the Burleys were making a claim under their major construction defect policy and on December 10 hired an adjuster, Tommy Duncan, to inspect the home. Additionally, CIGNA requested that Gordon Markel, a registered professional engineer, examine the residence to determine wheth-

er there existed a major construction defect as defined in the Burleys' policy. Both Duncan and Markel reported to CIGNA their conclusions that the damage to the Burleys' residence did not amount to a major construction defect under the policy. Accordingly, on February 18, 1987, Harold A. Richard, CIGNA's claims supervisor, sent the plaintiffs a letter denying coverage. Thereafter, neither the Burleys nor anyone on their behalf made any contact with CIGNA until the present suit was filed on June 23, 1988. After the suit was filed, a second registered professional engineer, Hugh H. Young, inspected the Burleys' home at the request of CIGNA and concluded that the policy criteria for a major construction defect were not met.

### YEOMANS

The Yeomans purchased their home in May 1979. The home was enrolled in the HOW program, with coverage effective May 3, 1979. In 1982, the Yeomans made their first claim under the major construction coverage provided by the policy. A CIGNA adjuster, William Lumpkin, and Hugh Young, an engineer, inspected the home and concluded that there was no major construction defect within the policy definition. Thus, CIGNA denied the claim. The Yeomans elected to arbitrate the claim pursuant to the terms of the policy and, following an arbitration decision in their favor, CIGNA paid for certain repairs to their home.

Thereafter, the Yeomans filed two more claims for repair of a major construction defect. As with the first claim, CIGNA inspected the residence, determined that the defects were not covered under the insurance policy, and issued letters to the Yeomans denying the claims. Plaintiffs again elected to arbitrate the denial of their claims. As to the first of these two claims, David M. Trigiana, an arbitrator from the American Arbitration Association, issued a written arbitration decision on October 22, 1984 which agreed with CIGNA that the claim was not covered under the insurance policy. Similarly, as to the last claim, arbitrator Eugene M. Hansen determined by

written award dated January 26, 1988 that there was no major construction defect within the policy definition. After the Yeomans' request for modification and clarification of Hansen's decision was denied, plaintiffs filed the present lawsuit. After the suit was filed, Hugh Young again inspected plaintiffs' residence and concluded that there was no major construction defect.

### WATKINS

In September 1978, Cleo Watkins purchased her home on Shenandoah Road in Jackson, and acquired with her purchase the warranty and insurance coverage pursuant to the HOW program. During the tenth year of coverage, Mrs. Watkins notified HOW that she was making a claim under the major construction defect coverage. HOW forwarded the claim to CIGNA whose senior claims representative, Ralph Edwards, inspected the residence. Because Edwards concluded that it was apparent that there was no major construction defect, he determined that no inspection by an engineer was necessary. By letter of February 2, 1988, CIGNA informed plaintiff that her claims for coverage were not compensable under the policy. Neither Mrs. Watkins nor anyone on her behalf made any contact with CIGNA from the time of denial until she filed the present suit on July 1, 1988. As with the claims of the other plaintiffs, after Mrs. Watkins commenced this action, Hugh Young inspected her residence and determined that the policy criteria of major construction defect were not met.

### THE POLICY

The policy for each of the three homes is a single-premium, minimum premium insurance policy underwritten by CIGNA which provided coverage against major construction defects during years three through ten. Under the policy, "major construction defect" is defined as:

Actual damage to the load-bearing portions of the Home (including damage due to Soil Movement as defined below) which affects its load-bearing function

and which vitally affects or is imminently likely to produce a vital effect on the use of the Home for residential purposes.

Each of the present three lawsuits arises out of claims made during years three through ten of the HOW warranty. The plaintiffs all allege entitlement to repair of their homes as a result of cracks, settlement and other defects which they claim amount to "major construction defects" under the policies at issue. In addition to their claims that defendants breached their policy obligations by their refusal to pay policy benefits, plaintiffs have asserted a variety of charges against defendants including breach of an implied covenant of good faith and fair dealing, breach of a fiduciary duty, fraud, intentional interference with protected property interests, unfair competition and deceptive trade practices, and bad faith denial of policy benefits. For defendants' alleged acts and omissions, plaintiffs seek to recover all premiums paid, all benefits provided by the policies, attorney's fees, prejudgment interest, and compensation for their embarrassment, humiliation and severe physical and emotional distress, as well as punitive damages.

### THE HOW PROGRAM: ENROLLMENT AND COVERAGE

The HOW program, as described above, was created by the various builder members of the National Association of Home Builders, ostensibly to demonstrate their commitment to good workmanship and the construction of quality homes. HOW Corporation, one of the defendants in these cases, was formed to develop and administer the program. The exhibits presented by defendants, and in particular the contracts between HOW and the various builders and between HOW and CIGNA, define HOW's function and HOW's relationship to the builders and to CIGNA. HOW developed the plan for coverage, arranged for security to back the builder's warranty and arranged insurance coverage for the major construction defect coverage. That coverage was underwritten by CIGNA pursuant to an agreement between HOW and CIGNA. HOW was responsible to collect the

premiums for the coverage and was to remit the appropriate premium to the insurer. In addition, HOW created and implemented Approved Standards for home construction to be followed by builders participating in the HOW program. HOW was also to recruit and register builders in the program and to screen those builders.

Under the Home Owners Warranty Agreement itself, the builder is named as the warrantor under the warranty which is in effect for the first two years of the ten years of coverage. During that time, as set forth above, the builder warrants that the home will be free from defects under certain conditions. Thereafter, the major construction defect insurance policy becomes effective and remains in effect for years three through ten. Under that policy, the builder and HOW are listed as the insureds. Owners whose homes are enrolled in the HOW program, therefore, receive the benefit of the major construction defect coverage provided their builders.

Information regarding the HOW program and the coverage of the program is provided to registered builders by HOW who, in turn, provide prospective home buyers with the information they have acquired from HOW. HOW also conducts training seminars to educate builders concerning various facets of the program. Each builder is supplied with a complete supply of policy forms which prospective home buyers may review upon request. The builder is responsible for enrolling homes in the HOW program and causing the warranty and insurance coverage to be issued and is also responsible to pay the premium for the HOW warranty.[2]

### THE COVERAGE ISSUE

■ In its motion for summary judgment, defendant CIGNA acknowledges that a jury issue exists as to whether the residences of the Burleys and the Yeomans have suffered a major construction defect within the terms of the policy. As to Mrs. Watkins' claim, CIGNA contends that it is entitled to judgment due to the lack of evidence that the "load-bearing portion of the (Watkins) home" has been damaged. The damage to Mrs. Watkins' home, as described in her claim statement, includes cracks in the exterior brick veneer, the patio slab and sidewalk, the interior sheetrock, the area around the fireplace on the interior wall and at the top of the kitchen cabinets. According to CIGNA, since none of these defects and cracks constitute damage to a load-bearing portion of the house, Mrs. Watkins' claim under the policy has no merit. Plaintiff, to controvert CIGNA's claim that there has been no covered damage to her home, has submitted the affidavit of James W. Miller, Jr., a registered professional engineer, in which Mr. Miller states his opinion that based on his inspection or investigation of Mrs. Watkins' home, the residence has experienced a major construction defect, as the term is defined in the policy. In addition, Don W. Agent, former head of the local HOW council, has stated his opinion, based upon an examination of photographs of the Watkins home, that the damage to the home is a major construction defect. Based on this evidence, the court finds that there does exist an issue of fact as to whether Mrs. Watkins' claim is covered and therefore concludes that CIGNA's summary judgment motion as to the Watkins claim should be denied.

### PLAINTIFFS' CLAIMS

### "MAJOR CONSTRUCTION DEFECT"

■ Plaintiffs argue that because the definition of "major construction defect" in the policy does not include more that the load-bearing portion of the house, it is too restrictive. However, there is no theory of liability pursuant to which defendants can be held liable simply for providing coverage which is restrictive. In short, the coverage provided is the coverage that was contracted for.

**2.** The court accepts as true plaintiffs' assertion that the premium charged the builder is passed on to the homeowner who ultimately pays for the coverage as part of the purchase price of the home.

Further, as to the definition of "major construction defect" in the policies under consideration, plaintiffs challenge the language as ambiguous. Under Mississippi law, where a policy provision is subject to more than one reasonable interpretation, it is said to be ambiguous. *See Employers Ins. of Wassau v. Trotter Towing Corp.*, 834 F.2d 1206 (5th Cir.1988). And, the court is to determine if there exists an ambiguity. *Id.* Here, though, plaintiffs have not advanced *any* interpretation which they contend is appropriate and reasonable. Rather, they have simply launched into an extended and, at times incomprehensible, criticism of the definition for the simple reason that they find it unduly restrictive.[3] Contrary to plaintiffs' assertion, while the policy does not cover every defect or purport to cover every defect, the provision is not meaningless. In fact, plaintiffs' retained experts have expressed their opinions that "major construction defects," as defined in the policy, exist in the residences of each of the plaintiffs.[4]

## HOW'S STATUS

HOW has moved for summary judgment contending that under the clear provisions of the home warranty documents, and in light of the strictly administrative functions it performs, it is not an insurer or warrantor under plaintiffs' policies and accordingly can have no liability to pay benefits or other damages based on a failure to pay policy benefits. Plaintiffs urge, though, that despite any statements to the contrary in HOW literature or the plaintiffs' policies, HOW held itself out to builders as an insurer under the program and should be treated as such for purposes of the plaintiffs' claims. Indeed, plaintiffs

have expended an enormous amount of their energies toward presenting proof for the proposition that HOW is an insurer under the HOW program or is engaged in a joint venture with CIGNA such that it should be subjected to liability as an insurer. In support of this assertion, plaintiffs claim that HOW did much more than merely administer the HOW program. According to plaintiffs, HOW collected premiums from its builders and retained unto itself a portion of those premiums; HOW inspected homes in both the construction and claims phases of the program and further, reviewed claims and claims files. In addition, HOW participated in a conciliation procedure when disputes arose between homeowners and builders. Plaintiffs also deem it significant that HOW provided builders and homeowners with literature, brochures and pamphlets bearing the "HOW" logo and placed signs in front of enrolled homes advertising them as being covered by "HOW: Ten Years of Home Protection." All of this conduct by HOW, plaintiffs aver, manifested to all reasonable observers of the program—including builders and the home buyers—that HOW itself was an insurer, when in actuality, unbeknownst to the builders and buyers, HOW had contracted with CIGNA for CIGNA to underwrite the HOW program.

The court has reviewed the evidence pertaining to plaintiffs' claim that HOW is an insurer and concludes that neither the warranty/insurance documents, the HOW/CIGNA contract nor the conduct of HOW demonstrate that HOW is subject to the standards or duties of an insurer. The contract between HOW and CIGNA sets forth the respective rates and liabilities of those parties and explicitly provides that

**3.** In 1981, the definition of the term "major structural defect" was amended. In plaintiffs' effort to demonstrate ambiguity, they repeatedly refer to and discuss the post–1981 language. That, however, has nothing whatsoever to do with the issues in this case, i.e., whether any of the plaintiffs' homes has a major construction defect within the meaning of the policies issued in connection with their homes.

**4.** The court notes plaintiffs' position that, consistent with the definition of "major structural

defect" in the policy, the defects to their homes do "vitally affect the use of the home for residential purposes," since the damage has substantially affected and diminished the likelihood of attracting any potential purchasers. Yet, plaintiffs were advised in HOW literature provided to them prior to or at closing that "[e]vidence that damage has affected the value of the home does not necessarily demonstrate that the use of the home for residential purposes has been affected."

HOW "is not an insurer under the Program, and shall have no liability whatsoever for structural defects or for the failure of the builder to perform its warranty obligations...." Additionally, the builder's limited warranty agreement issued to plaintiffs states that,

> [t]he National HOW Council and the Local HOW Council are not warrantors or insurers. Only the insurer named on page one is responsible for paying claims under the insurance coverage.

And, nowhere in the major construction defect policy is HOW listed as having any duties or responsibilities as an insurer; in fact, HOW is listed as an additional insured, along with the builder, under that coverage.

▇ Regarding HOW's conduct, HOW does have involvement in the claims process, and the policies so provide, but that involvement is limited to the following:

> If a claim arises with respect to the direct insurance against major construction defects during years three through ten after the commencement dates of this Agreement, you should notify your Local HOW Council, which will arrange with the insurer to investigate the claim.

Plaintiffs' evidence does not tend to establish that HOW's claims activities exceed that described in the policy. Indeed, according to the sworn statement of Don Agent, whose affidavit plaintiffs submitted in support of their claims, while HOW personnel may have "discussed" some claims with CIGNA representatives, no person at HOW had the responsibility or authority to or attempted to deny or pay a claim or to direct that CIGNA do so.[5] Moreover, none of the exhibits submitted by plaintiffs support their assertion that HOW personnel participated in the conciliation process or arbitration hearings. As to the payment of premiums, it is established that HOW collected premiums from builder members and was responsible to remit the premium payment to CIGNA, the insurer. Further, it is undisputed that HOW, pursuant to its agreement with CIGNA, retained a percentage portion of the premiums collected

for its administrative function. That retention by HOW of a part of the premium clearly does not make HOW an insurer.

Finally, as to what they contend is evidence of HOW's insurance activities, plaintiffs direct the court to a memorandum authored by David G. Fox, "founder" of the HOW program, in which Fox stated that the HOW program, during the period addressed by the memo, had "suffered unacceptably high losses," and that while the HOW corporation was stable, "the rising trend of claims ... must be slowed." The memo recited that "[t]o this end, our insurance partner, [CIGNA], is lending full cooperation toward improvement of claims handling...." Based on the referenced language, plaintiffs submit that HOW and CIGNA are "insurance partners" in what they characterize as the "joint venture" of the HOW program, and that HOW is, just as CIGNA is, an insurer in that program. Clearly, though, plaintiffs have read entirely too much into the various phrases and terms used in the Fox memorandum. Contrary to plaintiffs' characterization, the memorandum does not state that the HOW Corporation had suffered high losses but that the HOW *program* had sustained loss. The reference to the program in this context includes the insurer providing the HOW coverage, CIGNA. And, the HOW Corporation was a "partner" with an insurer, CIGNA; but the simple statement that CIGNA acted as HOW's insurance partner in no way implies that HOW was itself acting as an insurer. Lastly, nowhere in the memorandum is it stated or even intimated that HOW had any "insurance" responsibilities.

▇ Plaintiffs next urge that under Miss.Code Ann. § 83–5–5 (1972), HOW must be considered an "insurance company." That statute defines "insurance company" to include

> all corporations, associations, partnerships, or individuals engaged as principals in the business of insurance or *guaranteeing the obligations of others* (emphasis added).

---

5. *See infra* note 23.

Moreover, a contract of insurance is defined as

> an agreement by which one party for a consideration promises to pay for its equivalent or to do some act of value to the assured, upon ... loss ... in which the assured or other party has an interest, as an indemnity therefor.

Again, the warranty documents clearly state that HOW is neither a warrantor nor insurer under the HOW program. HOW has not agreed to guarantee the obligations of any other party involved in the program. Moreover, irrespective of any representations which may have been made to plaintiffs by their builders, plaintiffs do not assert that any HOW representative made any statements or representations of any sort to plaintiffs.[6]

In sum, therefore, HOW is not an insurer or warrantor with respect to the HOW program. Rather, it is the administrator of the program under which the builder issues a written warranty and CIGNA underwrites the major construction defect policies for years three through ten. It follows that while HOW can be subjected to liability for its activities relative to its administration of the program, it can have no liability to plaintiffs for their claims concerning the failure to pay policy benefits.

## BAD FAITH DENIAL OF INSURANCE BENEFITS

■ Proof of a "bad faith" refusal to pay an insurance claim, so as to entitle the insureds to punitive damages, requires proof of both (1) the absence of a legitimate or arguable reason to deny the claim and (2) malicious conduct, gross negligence or reckless disregard of the rights of others, so as to constitute an independent tort. *See Aetna Casualty & Surety Co. v. Day*, 487 So.2d 830, 832 (Miss.1986). In the case *sub judice*, plaintiffs claim to have proof to satisfy each of these elements. Yet, they contend that even if they are ultimately unable to prove lack of a legitimate or arguable reason for CIGNA's refusal to pay their claims, they may nevertheless establish their "bad faith" cause of action based on a course of conduct by the defendants toward plaintiffs and others.

### Legitimate or Arguable Reason

The court first notes plaintiffs' contention that defendants committed bad faith by refusing to give any reasonable interpretation to the policy definition of "major structural defect" so as to frustrate and bar plaintiffs' recovery of policy proceeds. The court has concluded, *supra*, that plaintiffs' claims regarding policy interpretation are without merit.

Plaintiffs next claim that in connection with their investigation of each of their claims for policy proceeds, CIGNA's claims personnel failed to follow CIGNA's own established adjusting procedures, as set forth in "The [CIGNA] Training Guide to HOW Claims." Plaintiffs, however, have failed to establish that there exist specific requirements which CIGNA requires its claim adjusters to follow in each case presented for investigation.[7]

---

**6.** Plaintiffs' apparent theory is that HOW employees made representations to the builders in the program, including plaintiffs' builders, and that the builders, in turn, made representations to plaintiffs that HOW would guarantee the builders' work and cover any construction defects. This contention is addressed *infra,* in connection with plaintiffs' deceptive practices/misrepresentation allegations.

**7.** In their brief, plaintiffs represent that there are a number of specific steps which CIGNA adjusters *must* follow as to each claim presented for evaluation, including, for example, a requirement that the claims representative view not only the damage pointed out by the homeowner but also other areas of the house, including the attic and roof, a requirement that the investigation be conducted with reference to the builder's compliance or noncompliance with HOW's Approved Standards, and a requirement that a professional engineer be retained if deviations from the Approved Standards are found and there is evidence of a major construction defect. As evidence of these requirements, plaintiffs direct the court to a 174–page document entitled "The [CIGNA] Training Guide to HOW Claims." They fail, however, to indicate where in that exhibit these "required steps" can be found. Defendant CIGNA denies that there are any such steps that are required to be followed, stating that the steps are a "figment of plaintiffs' imagination." Under the circumstances, the court concludes that plaintiffs' have failed to present evidence in support of their claim that these standards exist.

*Burley Claim*

■ The Burleys' claim was denied after an independent adjuster, Tommy Duncan, and an independent registered professional engineer, Gordon Markel, had inspected the home and concluded that the defects in the home did not amount to a major construction defect. CIGNA's denial was communicated to the Burleys in a letter in which the Burleys were advised that "should [they] have any questions regarding this matter, please do not hesitate to contact our office." Plaintiffs admit that they made no contact with CIGNA after receiving the denial letter to question the decision or request further information. Instead, almost a year and a half later, they filed the present lawsuit in which they allege that their claim was denied without a legitimate or arguable reason. And as previously stated, after the lawsuit was filed, CIGNA sent another engineer to inspect the Burleys' home, Hugh Young, who concluded based on his inspection that the damage to the house did not qualify as a major construction defect.

As a basis for their bad faith allegation, plaintiffs first complain that CIGNA did not adequately investigate, stating that their claim was not adjusted in light of HOW's Approved Standards for builders since the opinions of the adjuster and engineer did not refer to those standards and since the engineer did not procure or attempt to obtain a soils engineer report pertaining to the subdivision in which the Burleys' home is located. What is charged by plaintiffs in this regard is that no effort was made to determine the appropriateness of the foundation design in view of the soil in the area. Clearly, it was not incumbent upon CIGNA to evaluate the sufficiency of the design or the quality of the builder's work or to obtain a soil report toward that end.[8] From CIGNA's perspective, in its investigation of a claim under the policy, whether a foundation design is inappropriate, inadequate or defective is not relevant. What is relevant is whether there exists a major construction defect within the mean-

ing of the policy. While a defective foundation design might cause or contribute to the existence of a major structural defect, what is determinative under the policy is not the design but rather the existence of a resulting major construction defect.

■ The Burleys next take issue with CIGNA's characterization of Gordon Markel as an "independent" professional since the consulting firm by which Mr. Markel was employed was consistently hired by CIGNA to adjust claims and Mr. Markel himself had been repeatedly hired to adjust claims for CIGNA. A similar claim is made covering Hugh Young. Obviously, the use of the term "independent" as it relates to Mr. Markel and Mr. Young refers to the fact that they were not employees of CIGNA but were retained by CIGNA for the purpose of providing engineering services in the adjustment of claims. Whether they were "independent" or were more akin to employees of CIGNA is of no significance; regardless of Mr. Markel's or Mr. Young's working relationship with CIGNA, it nevertheless appears that both are qualified professionals. Indeed, plaintiffs have not challenged their credentials as registered professional engineers but have simply attempted to imply that the utilization of their services by CIGNA was somehow inappropriate because CIGNA had used their services in the past. That is no basis for a claim of bad faith by CIGNA.

■ Finally, the Burleys contend, as a facet of their bad faith charge, that their claim was incorrectly adjusted since it was adjusted with reference, not to the definition of "major construction defect" that was contained in their policy, but rather by use of a definition of the term that was implemented *after* the plaintiffs purchased their policy. In 1981, the definition of "major construction defect" was revised; the phrase, "is imminently likely to produce a vital effect on the use of the home for residential purposes," was omitted and in its place, coverage was provided where the

---

8. Since the Jackson area is not an "active soils" area under the HOW program, *see infra* p. 858, these requirements referenced by plaintiffs had no application to the investigation of their claims.

damage to the load-bearing portions of the home rendered the home "unsafe, unsanitary or otherwise unlivable." In his report, Tommy Duncan stated, "I feel we may have a legitimate MSD claim if this buckling worsens much in the near future.... At this time, however, I don't believe it qualifies as unlivable." According to plaintiffs, the terminology used by Duncan in his report demonstrates that he adjusted the claim under the latter, more restrictive definition of "major structural defect." Even assuming that is the case, it does not support a claim of bad faith particularly since Duncan's opinion was not the sole basis for CIGNA's decision that the claim was not covered. After Duncan examined the Burleys' home, Mr. Markel inspected the house and concluded that

> [t]he defects observed do NOT represent actual damage to a load-bearing portion of the residence. The load-bearing capacity of the structural member has not been affected such that it can no longer support the design load. The observed defects presently do not affect the use of the structure for residential purposes; nor are they imminently likely to do so.

Mr. Markel's conclusion was reached in accordance with the policy definition contained in the Burleys' policy and not the later-implemented definition. His opinion furnished an "arguable reason" for CIGNA's denial of the claim. *See Jernigan v. INA Underwriters Ins. Co.,* No. 86–4867 (5th Cir. April 8, 1987) [816 F.2d 676 (table) ].[9]

### Yeomans Claim

■ CIGNA denied the Yeomans' second and third claims after its claims representative, Ralph Edwards, and Hugh Young, a registered professional engineer, inspected the home and concluded that the damage complained of did not qualify as a major structural defect. The Yeomans elected to arbitrate their claims through the American Arbitration Association and, following two hearings, one before arbitrator David Trigiani and a second before arbitrator Eugene Hansen, decisions were made supporting CIGNA's conclusion. The Yeomans then brought this action against defendants HOW and CIGNA. These plaintiffs argue that the investigations of their claims were grossly inadequate and that the denial of their claims, based on those investigations, was in bad faith. The various components of this claim by the Yeomans, to the extent the court is able to discern them, are addressed as follows.

Initially, plaintiffs assert that because there is no structurally engineered and designed foundation existing at their residence, then a major construction defect exists. As the court concludes, *infra,* there is no requirement under the HOW Approved Standards or the policy that plaintiffs' home have been constructed with an engineer-designed foundation.[10] Accordingly, there is no basis for this allegation. They next claim that because their claims were not adjusted in accordance with and with reference to HOW's Approved Standards, the investigation was inadequate. There is nothing in any of the exhibits cited by plaintiff in support of this proposition that imposes any requirement that reference need be made to the Approved Standards in the adjustment of claims. What must be considered is the policy definition of "major structural defect," for what is relevant and determinative of a claim under the policy is whether such a defect exists. A builder's compliance with the standards is not relevant except to the extent that failure to comply leads to a major structural defect and in that event, what is important is the defect and not the standards.

■ Another area of investigation cited as deficient by plaintiffs concerns the qualifications and actions of Ralph Edwards, the claims representative responsible for the

---

**9.** In *Jernigan,* this court had, at trial, determined that INA, now CIGNA, had a legitimate or arguable basis for denying the plaintiffs claim for major construction defect benefits based on the inspections and opinions of Tommy Duncan and Gordon Markel. The court, therefore, directed a verdict for INA on the plaintiff's claim of bad faith. The Fifth Circuit concluded that the directed verdict had been properly granted, citing the opinions of Duncan and Markel that there was no major construction defect. *See Jernigan,* slip op. at 7.

**10.** *See infra* p. 858.

Yeomans' claim. In particular, they assert that Mr. Edwards had no experience in handling major construction defect claims for CIGNA "other than other HOW claims he [had] worked on;" he did not obtain the services of a soils engineer in connection with his investigation; he did not take into account HOW's Approved Standards; and he did not contact the builder. The first allegation is presumably intended to imply that Edwards was inexperienced in the adjustment of HOW claims; however, Edwards' experience or lack of experience is of no relevance unless plaintiffs could demonstrate that his relative lack of experience affected the quality of his investigation.[11] And, as stated elsewhere in this opinion, CIGNA personnel were under no obligation to utilize a soils engineer or contact the builder concerning his compliance with HOW's Approved Standards. Moreover, for the reasons heretofore stated, any failures to take those steps in the course of the investigation do not support an inference that the investigation was inadequate; specifically, neither the soil nor the builder's performance is relevant if there is no major construction defect—and both the adjuster and engineer concluded that there was no major construction defect. On their opinions, CIGNA had an arguable basis for its decision to deny their claims. *See Jernigan,* 816 F.2d 676.

### Watkins Claim

■ Cleo Watkins' claim was denied after Ralph Edwards inspected her home and concluded that the damages for which she complained did not affect the load-bearing structure of the home and were therefore not compensable under the policy. Around the same time, a local foundation specialist, Thomas J. Murray, examined Mrs. Watkins' home at her request and "didn't really see that much wrong with the house." According to Mr. Murray, he "didn't consider it as being that bad when I looked at it," and thus he did not consider that the damage of which she complained warranted any repair work around the time the denial

decision of CIGNA was made. Based on its findings, CIGNA determined that the absence of a major construction defect was obvious and it was not required that an engineer be consulted. The circumstances relative to the Watkins home demonstrate that as a matter of law there existed a reasonable basis for the denial of her claim. At most, there was a difference of opinion as to the extent of the damage and whether the damage could be considered a major structural defect. That alone will not support a finding of bad faith. *See Horton v. Hartford Life Ins. Co.,* 570 F.Supp. 1120 (N.D.Miss.1983).

### Course of Conduct Evincing Bad Faith

■ Plaintiffs, citing *Independent Life and Accident Insurance Company v. Peavy,* 528 So.2d 1112 (Miss.1988), contend that even though an insurer may have an arguable reason for denying a claim, its course of conduct may nevertheless prove such an insult, fraud, oppression or reckless disregard for the rights of its insureds, or show such willful, intentional wrong or such gross negligence or reckless conduct as to be the equivalent of such a wrong. They urge that they have evidence demonstrating a course of conduct by CIGNA and HOW, pursuant to an alleged agreement between those parties, of denial of covered claims in the Jackson Metropolitan area without justifiable reason. Toward that end, plaintiffs have presented affidavits of six dissatisfied homeowners who, like plaintiffs, harbor a belief that defendants wrongfully refused to pay their legitimate claims under the major construction defect coverage. Plaintiffs submit that a vast number of similar claims exist which have arisen out of claims made in the Jackson area, and they propose to utilize evidence of those similar claims to prove defendants' alleged course of conduct in considering and handling of claims in such a manner as to frustrate recovery by insureds, and in denying claims in which liability is clear, such as those of the plaintiffs in this case.

11. The court notes that Edwards' report was reviewed and his opinion was concurred in by Claude McVaugh, CIGNA's home office supervisor, who had examined and reviewed approximately 10,000 major construction defect claims.

This court, in *Jernigan v. INA Underwriters Insurance Co.*, addressed the issue concerning the admission of "similar claims" under virtually the same facts as are here presented and concluded that such evidence was inadmissible. The court is again of the opinion that the proposed evidence should not be allowed. First, plaintiffs here have not demonstrated that the claims in question are, in fact, similar except, of course, to the extent that those claims were denied by CIGNA. The evidence does not show that the claims are genuinely "similar" claims but rather that they are merely "other" claims having denial as the only common ground with plaintiffs' claims. Given that minimal similarity, the proposed evidence can not be considered at all probative on the issues presented in the cases at bar. The mere dissatisfaction of other homeowners as to other claims has no bearing on the propriety of CIGNA's denial of the present plaintiffs' claims. That is, under the facts presented, the denial of other claims has nothing whatsoever to do with these lawsuits; each of the plaintiffs' bad faith claims must stand or fall on its own merit, and the court has determined that in the case of each plaintiff, there was a legitimate basis for the denial of the claim. Moreover, unlike the factual situation presented in *Peavy*, plaintiffs here do not allege, or at least cannot support, a claim that the defendants engaged in a course of conduct toward them individually, but rather to establish *their* claims of bad faith they rely on an alleged course of conduct toward insureds generally in the Jackson area. And, the only conduct cited is the mere denial of claims which have not been shown to have any more than a slight similarity to plaintiffs' claims.

Even if it could be said that evidence of other claims was of some relevance to some issue presented, its minimal probative value under the circumstances of this case does not justify its admission when weighed against the enormous waste of time that its admission would necessarily entail. *See In re Agent Orange Products Liability Litigation,* 611 F.Supp. 1223, 1256 (E.D.N.Y.1985) (waste-of-time ground for exclusion very persuasive when detailed rebuttal testimony is needed to establish lack of probative value of proposed evidence). Without question, if evidence of other claims were allowed by the court, there would be, in effect, a mini-trial on each such claim. That is wholly unacceptable where the only claims that are material are the claims of the plaintiffs in this litigation. In sum, the admission of such evidence would be unduly time-consuming, unfairly prejudicial and unnecessarily confusing and will not be permitted. That being the basis for plaintiffs' effort to demonstrate bad faith in the event a legitimate basis for denial is found to exist, their bad faith/wrongful denial claims must fail.

## ACTIVE SOILS AREAS

Plaintiffs discuss at length in their brief HOW's Approved Standards as they relate to the standards for the performance of HOW builders in "active soils" areas. Generally, the special standards for "active soils" areas require thorough soil testing by a soils engineer, utilization of an engineer-designed foundation system if the soils report so recommends, inspection and certification by a licensed engineer verifying that the construction conforms to the design, and a final grading plan prepared by a certified land surveyor showing compliance with the drainage requirements, copies of which must be furnished to the home buyer. It is undisputed that none of these standards were complied with as to these plaintiffs' homes. Plaintiffs reason, therefore, that since HOW failed to enforce its own standards but nevertheless allowed plaintiffs' homes to be enrolled in the HOW program, then HOW and CIGNA insured the plaintiffs' homes at their own risk such that their homes are *ipso facto* covered under the HOW program.[12] Plaintiffs' argument, however, is predicated upon an

---

**12.** Presumably, by this, plaintiffs mean not that their homes are covered under the HOW program, for there is no dispute as to that, but rather that the damage their homes sustained is covered.

incorrect premise. That is, the argument assumes that the areas in which their homes were built are "active soils" areas. The evidence establishes that is not the case. Under the HOW program, only four areas are classified as "active soils" or "Special Standards" areas: Tulsa, Oklahoma; Denver, Colorado; Dallas, Texas; and Gainesville, Florida. Compliance with the Special Standards for an active soils area was therefore not required.

## HOW'S SCREENING OF BUILDERS

It is undisputed that one of HOW's administrative functions was the recruitment and screening of builders for enrollment in the HOW program. Plaintiffs purport to seek recovery based on an alleged failure by HOW to adequately screen the builders it enrolled in the program. According to plaintiffs, HOW conducted no inquiry into the qualifications of builders or of their knowledge of residence construction, but rather simply "loosely investigated" the builders' financial stability. Any failure by HOW in this regard cannot constitute a cause of action for plaintiffs. An interesting analogy is provided by defendant HOW: such an assertion would be analogous to permitting an injured party to maintain a claim against a tortfeasor's automobile liability insurer for failure to screen more carefully the types of drivers insured. Such a cause of action is clearly not recognized by the courts of Mississippi.[13]

## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs' complaints charge that defendants breached an implied covenant of good faith and fair dealing by refusing to pay benefits due under the policies. As the court has concluded above, HOW, not being an insurer and not otherwise being in a contractual relation with the plaintiffs, can incur no liability under this theory advanced by plaintiffs and thus is entitled to summary judgment as to this

claim. CIGNA is likewise entitled to judgment on this claim for the insurance contract at issue contains no implied covenant of good faith. Mississippi law does not provide a cause of action for breach of an implied duty of good faith and fair dealing in an insurance context where a claimant seeks policy proceeds. Rather, the only circumstance in which such a cause of action is recognized is when an insurer fails to honor the defense of its insured against claims made by third parties. This principle was observed by the court in *Harrison v. Benefit Trust Life Ins. Co.*, 656 F.Supp. 304 (N.D.Miss.1987), in which the court concluded that the law in Mississippi does not impose a duty of good faith and fair dealing in the context of a first-party insurance contract; the duty is imposed upon an insurance company "only when it is in the position of a liability insurer and is contractually obligated to defend its insured from suit." *Harrison*, 656 F.Supp. at 305 (citing *State Farm Mut. Auto Ins. Co. v. Commercial Union Ins. Co.*, 394 So.2d 890, 894 (Miss.1981), and *Gorman v. Southeastern Fidelity Ins. Co.*, 621 F.Supp. 33, 38 (S.D.Miss.1985), *aff'd*, 775 F.2d 655 (5th Cir.1985)). In an effort to escape application of this rule, plaintiffs assert that theirs are "classic" examples of third parties, homeowners, seeking recovery under their builders' policies. Under the HOW program, the builder and HOW are the named insureds under the policy issued to homeowners. Plaintiffs reason, therefore, that they are claiming benefits not as insureds but rather as third parties making a claim against the builders' policies. Accepting plaintiffs' characterization, the court must nevertheless conclude that their claim fails. As mere claimants under the policy of the builder, no duty of good faith runs to plaintiffs; instead, any such duty is owed the builder and can only be breached as to the builder. And even as to the builder, the duty has been recognized in Mississippi only with reference to the insurer's failure to comply with a contractual duty to defend its insured. *See Griffin v.*

---

**13.** There is in the record, in any event, testimony of HOW representatives that HOW, on a random basis, examined and monitored pro- spective builders' construction practices to verify technical competence.

*Ware,* 457 So.2d 936 (Miss.1984). Hence, only the builder or HOW could assert a cause of action against CIGNA for breach of an implied duty of good faith and fair dealing. CIGNA is therefore entitled to judgment on this claim.[14]

## BREACH OF FIDUCIARY RELATIONSHIP

Plaintiffs allege in counts III and IV of their complaints respectively that CIGNA and HOW, by failing to ensure that plaintiffs received benefits under their policies, breached their fiduciary duties to plaintiffs. However, just as there is no implied covenant of good faith in a first-party insurance contract, there is no fiduciary relationship between an insurer and insured in a first-party contract. *See Davidson v. State Farm Fire & Cas. Co.,* 641 F.Supp. 503, 514 n. 8 (N.D.Miss.1986); *Harrison,* 656 F.Supp. at 305; *Gorman,* 621 F.Supp. at 38. Again, even accepting plaintiffs' contention that they are not insureds under the policies, but are mere claimants of policy proceeds in the contract between the builder and the defendants, the court concludes that they cannot maintain a claim for breach of fiduciary relationship. Under Mississippi law, only an insured may bring a claim for breach of fiduciary relationship against its insurer when the insurer fails to provide a defense of indemnification from claims by third parties. *See Gorman,* 621 F.Supp. at 38. Defendants are therefore entitled to judgment as a matter of law as to counts III and IV of the complaints.

**14.** Curiously, plaintiffs charge that under the HOW program, the builder is absolved from common law liability and statutory liability so that the existence of a HOW warranty operates to prevent them from asserting a claim directly against the builder. There is nothing whatsoever in the record to demonstrate that the HOW warranty is an exclusive remedy. In fact, the builders participating in the HOW program entered into an "Agreement of Builder and Local Warranty Council" which provides specifically that "Builder shall be responsible to defend against any claim or portion of a claim brought against Builder to recover on any basis other that under the Certificate (or Insurance Coverage)." There thus appears to be nothing to preclude a homeowner's bringing a separate claim against a builder for construction defects to the extent permitted under Mississippi law. *See Keyes v. Guy Bailey Homes,* 439 So.2d 670 (Miss.1983); *Brown v. Elton Chalk, Inc.,* 358 So.2d 721 (Miss.1978).

## INTENTIONAL INTERFERENCE WITH PROTECTED PROPERTY RIGHTS

In count VII of their complaints, plaintiffs allege that they had a protected property interest in the benefits that became due them when their homes suffered a covered loss. They charge that defendants, by failing to provide them with those benefits, willfully interfered with their protected property interest. The basis for the assertion of this theory of liability in the circumstances of this case is far from clear. Under Mississippi law, a party to a contract may maintain an action where his contractual rights are affected by a third party who willfully procures a breach of that contract. *Cranford v. Shelton,* 378 So.2d 652 (Miss.1980); *Southwest Drug Co. v. Howard Bros. Pharmacy of Jackson, Inc.,* 320 So.2d 776 (Miss.1975). Yet here, plaintiffs have not divulged what third party is claimed to have breached a contract to which plaintiffs were parties. Indeed, their allegation is essentially one that the defendants breached a contractual duty arising from the major construction defect policy itself and owed, either directly or indirectly, to plaintiffs themselves.

In this regard, plaintiffs assert that while they each actually contracted with their respective builders for the warranty and insurance provided by the HOW program, they were led to believe that they were contracting with HOW and thus, presumably, that HOW should be treated as having contracted with plaintiffs to provide warranty and insurance coverage. Their only allegation of intentional interference is based on HOW's and CIGNA's failure to pay benefits to them under that contract.[15]

**15.** The court here is simply attempting to state the apparent basis claimed by plaintiffs to support their intentional interference claim. The court has, of course, already determined that HOW did not contract to provide insurance coverage or warranty protection under the HOW program.

Thus, it does not appear to be their position that the defendants, as strangers to the contract, procured a breach of the contract, but rather that defendants, as parties to the contract, actually breached the contract itself. A party to a contract, however, cannot be held to have procured a breach of its own contract. Thus, plaintiffs' theory of liability against HOW for intentional interference is plainly not viable.

■ The same conclusion holds true as to defendant CIGNA. Plaintiffs' memorandum states that CIGNA was under a duty not to interfere with plaintiffs' contracts with either HOW or the home builders and that "[i]n doing so, defendant CIGNA may be held liable." Yet plaintiffs fail to state what CIGNA did to interfere. Presumably, its "interference" was its failure to pay policy benefits. But in that respect, CIGNA is not a third party to the contract but rather is the insurer, and the very entity responsible to pay in the event of a covered loss. By failing to pay, CIGNA may have breached the contract, but it certainly did not "interfere" with or procure a breach of the contract as that cause of action is understood in Mississippi. Plaintiffs' claims, therefore, cannot stand.

## UNFAIR METHODS OF COMPETITION/DECEPTIVE TRADE PRACTICES

■ Plaintiffs allege in count XI that defendant CIGNA's acts constituted unfair methods of competition and deceptive practices in violation of Miss.Code Ann. § 83–5–

35 (1972). This statute, however, pertains solely to the regulatory authority of the Mississippi Insurance Commission and does not create a private cause of action. *Protective Services Life Ins. Co. v. Carter*, 445 So.2d 215, 218 (Miss.1984); *Watson v. First Commonwealth Life Ins. Co.*, 686 F.Supp. 153, 155 (S.D.Miss.1988). In view of this clear authority, plaintiffs concede that they must abandon their claims based on section 83–5–35. They seek to amend their complaints, though, to allege claims based on violations of Miss.Code Ann. § 97–23–3 and § 75–24–1.

■ Section 97–23–3, which explicitly provides for civil tort liability, prohibits advertisements which contain "any assertion, representation or statement of fact which is untrue, deceptive or misleading." In support of their present assertion that CIGNA violated this provision, plaintiffs refer to a brochure entitled "The [CIGNA] Guide to HOW Claims," which was forwarded to plaintiffs by CIGNA.[16] Initially, plaintiffs complain that the brochure contained misleading representations as to what would constitute a "major construction defect" that would be covered. Plaintiffs also refer more generally to representations by HOW by way of advertisement, brochure and literature provided to plaintiffs prior to and at closing that were allegedly misleading as to the coverage for "major construction defects." However, nothing in the CIGNA brochure or in the HOW documents provided as exhibits [17] is inconsist-

---

**16.** Interestingly, in their effort to demonstrate that HOW was the insurer under the HOW program, *supra*, plaintiffs state that they did not learn of CIGNA's involvement in the program until after closing and hence after coverage was in place. Yet, to support their misrepresentation claim against CIGNA, plaintiffs assert that they relied on CIGNA brochures in deciding they wanted to procure the coverage provided by the HOW program. For purposes of the issue presently under consideration, the court will assume that plaintiffs intended the latter allegation to represent the true state of affairs.

**17.** Plaintiffs made no effort whatsoever to meaningfully direct the court to the specific statements claimed to be misleading or fraudulent but rather directed the court generally to a large number of lengthy exhibits. Indeed,

plaintiffs provided the court with thousands of pages of exhibits and bothered only rarely in the course of their 74–page brief to specify the basis for their citation to a particular exhibit or exhibits. Only in a very few instances did plaintiffs inform the court of the location, within a particular exhibit, of the information pertinent to a claim under consideration. While this methodology could perhaps have proved only a slight hindrance to this court's task of discerning the factual basis and whether there existed any factual support for plaintiffs' many unusual claims, the court's difficulties were greatly compounded by plaintiffs' citation to 10, 20 and even 30 or 40 exhibits in support of numerous statements contained in the brief. The court would point out that it should not be placed in the position of searching through the entire record for materials which might support a party's claims. Rath-

ent with the coverage language of the policy actually issued, nor are there any representations in these documents which are even arguably misleading concerning the coverage that would be provided under the HOW program.[18] Plaintiffs' real objection is not that the brochure and other documents provided are misleading regarding the coverage that would be granted; rather, plaintiffs are simply dissatisfied with the coverage actually provided under the contract. That will not support the cause of action proposed to be added by amendment to the complaint.

■ Plaintiffs next complain that the CIGNA brochure and HOW literature contained statements that misled plaintiffs concerning arbitration of claims submitted under the HOW program. Specifically, the Yeomans contend that they submitted to arbitration because they were misled by a representation in the brochure that if they elected to request arbitration, they "didn't have to accept the arbitrator's decision, but [the] builder [would be] obligated to comply with his ruling if [they did] accept it;" only

after they had received two unfavorable arbitration decisions did they learn that under the HOW program, while arbitration is not binding on the homeowner for disputes arising during the first two years of the warranty, it is binding during years three through ten. Plaintiffs thus aver that they have suffered damage as a consequence of their reliance on the misrepresentation regarding arbitration. Apparently, defendants have not brought an action to confirm the arbitration award and plaintiffs, despite the fact of two unfavorable arbitration decisions, have filed this suit to recover benefits—the same benefits denied by the arbitrators; accordingly, the Yeomans cannot be said to have sustained any damage as a result of any representation regarding arbitration. It would therefore prove futile at this point to permit the Yeomans to amend their complaint to allege a claim based on this alleged misrepresentation and as such, the amendment will not be granted.

■ Plaintiffs also request to be allowed to amend their complaint to assert a

---

er, the party is, under the rules, required to demonstrate to the court that there is support in the record for his assertions; plaintiffs' efforts in this regard have been most inadequate. Nevertheless, the court has made every reasonable effort to wade through the exhibits for the purpose of discovering what plaintiffs deem relevant and supportive of their case.

18. The CIGNA brochure stated, in pertinent part, as follows:

The claim of a Major Structural Defect in the structure of a house may require extensive investigation. *Not all damage is structural;* and not all structural damage conforms to the policy definition of a Major Structural Defect.... An eligible Major Structural Defect must meet two additional criteria: A) It must represent actual damage to the load-bearing portion of the home that affects its load-bearing function; *and* B) The damage must vitally affect or be imminently likely to produce a vital effect on the use of the home for residential purposes.

Comparison of this explanation with the policy definition reveals a perfect consistency. Similarly, a brochure entitled "[HOW Corporation] Approved Standards," which concededly was provided to plaintiffs prior to or at closing, explained the coverage explicitly as follows:

An eligible major structural defect must meet two criteria: (A) it must represent actual dam-

age to the load-bearing portion of the home that affects its load-bearing function; and (B) The damage must vitally affect or be imminently likely to produce a vital effect on the use of the home for residential purposes.
A. The Load–Bearing Criteria:
1. The load-bearing portion of the home for the purpose of the HOW program is defined as the framing members and other structural elements that transmit the dead and live loads to the supporting ground.

.    .    .    .    .

2. It must be *actual* damage. This means that the defect must represent a structural failure of some part of the load-bearing system.
3. An eligible defect must *affect* the load-bearing function. The load-bearing portion of the home is to remain stable and must maintain its capacity to transmit the imposed live and dead load to the ground.
B. Vitally Affects the Use of the Home for Residential Purposes. To be eligible, a defect in the load-bearing portion of the home does not have to render the home dangerous or otherwise uninhabitable. However, it must be of such a serious nature that it vitally affects the use of the home for residential purposes.
This explanation described the coverage accurately and put plaintiffs on notice that not all defects would be covered.

violation of Miss.Code Ann. § 75–24–1 *et seq.* (Supp.1989), Mississippi's Consumer Protection Act. In particular, plaintiffs desire to allege a violation of section 75–24–5, which prohibits a provider of goods or services from representing that those goods or services have characteristics, benefits and uses that they do not have or representing that services are of a particular standard, quality or grade, if they are of another. The court concludes that the policy at issue in the case at bar is not a "good" or "service" and accordingly, the cited statute is inapplicable. In any event, a review of the literature of the defendants reveals that defendants made no representations which could subject them to liability under the statute even if it were applicable. Section 75–24–101 of the Act, also claimed by plaintiffs to have been violated and sought to be added by amendment, prohibits the use of certain promotional devices for the purpose of soliciting sales of interests in real property without disclosure of specified information. However, even a cursory review of the statute demonstrates beyond question that it has no application in the case at bar. The protection provided by the HOW program does not even remotely resemble any of the promotional devices restricted from use by the statute.[19] The motion to amend to add a claim for the violation of this section is therefore denied.

## FRAUD AND CONSPIRACY TO DEFRAUD

In counts V and VI of their complaints, plaintiffs assert generally that defendants, at the time of issuance of the major construction defect insurance to plaintiffs, promised to pay benefits in accordance with the policy coverage with no intention of performing in good faith and with the intent and purpose to deceive plaintiffs and to induce them to purchase and accept the insurance policies. Plaintiffs contend that they justifiably relied on those promises by defendants in purchasing the policies and have been damaged as a result of defendants' failure and refusal to pay. Further, in count XII, plaintiffs allege that defendants engaged in "the act of denying similar claims" in the Jackson Metropolitan area without giving fair and equal consideration to the interests of its insureds, including plaintiffs. Plaintiffs have, in fact, catalogued in their complaints a number of alleged acts by defendants in connection with this allegation which they contend demonstrate that defendants engaged in a "conspiracy to defraud" and to "pursue the defrauding" of unsuspecting homeowners and claimants, including plaintiffs:

1. Misrepresenting to their insureds, including plaintiffs, provisions of the limited home warranty agreement and major construction defect insurance;

2. Failing to acknowledge and act reasonably promptly with respect to claims under the policy;

3. Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims;

4. Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

5. Advising its insureds, including plaintiffs, to submit their claims to arbitration;

6. Intentionally dealing unfairly and dishonestly with claims of homeowners under the HOW program, including plaintiffs;

7. Failing to give fair and equitable consideration to homeowners under the HOW program, including plaintiffs;

8. Misrepresenting provisions regarding the binding effect of arbitration;

9. Intending to injure homeowners and consciously pursuing a course of conduct knowingly to create a risk of harm to homeowners enrolled under the HOW program, including plaintiffs;

10. Unreasonably breaching the justifiable expectations of insureds in the Jackson metropolitan area, including plaintiffs;

---

**19.** The statute specifies the types of devices prohibited: "sweepstakes, lodging, certificate, gift, award, premium, discount, drawing, prize or display."

11. Intentionally breaching the implied covenant of good faith and fair dealing;

12. Conspiring to defraud its insureds, including plaintiffs, by misrepresenting that the major construction defect insurance protects homeowners in the event their home sustains foundation damage as a result of soil movement;

13. Continuing in a course of conduct of tortious bad faith in utilizing "economic coercion" against its insureds, including plaintiffs;

14. Acting in such a manner as to indicate a general business practice of denying claims without justifiable, legitimate or arguable reasons;

Plaintiffs' brief adds two additional claims that do not appear in the complaint:

15. Unfairly and dishonestly adjusting claims in the Jackson metropolitan area;

16. Denying claims in the Jackson metropolitan area, insofar as defendants engage in a common scheme.

While it can easily be seen that the majority of these claims of "fraud" are merely restatements by plaintiff of the many and varied claims contained in other counts of the complaint heretofore disposed of by the court, in an effort to ensure that consideration is given to all issues raised by the present motions, the court will consider and address each of the above listed allegations. First, though, since the plaintiffs characterize each act listed as an instance of "fraud" by defendants, it should be understood what must be proved to substantiate a claim of fraud under the law of Mississippi. The elements of the cause of action are well established: (a) a represen-

tation, (b) its falsity, (c) its materiality, (d) the speaker's knowledge of its falsity or ignorance of its truth, (e) his intent that it should be acted upon by the person and in the manner reasonably contemplated, (f) the hearer's ignorance of its falsity, (g) his reliance upon its truth, (h) his right to rely thereon, and (i) his consequent and proximate injury. *Watson v. First Commonwealth*, 686 F.Supp. at 154–55.[20]

Presumably, no. (1) above is intended to refer to alleged misrepresentations by the defendants as to the extent of the major construction defect coverage that would be provided by the policy. The court has already concluded that the brochures and literature provided to plaintiffs accurately described the coverage available under the HOW program and did not mislead or misrepresent any facts to plaintiffs.[21] Allegations (2) and (3) concern an alleged failure by defendants to promptly investigate and process claims. These clearly do not concern "representations" of any sort and thus, cannot form the basis for a charge of fraud. In any event, the evidence of record establishes that in the case of each of the plaintiffs, the time involved in the claims process was at least reasonable and one could not reasonably conclude otherwise.[22] Number (4), likewise, does not involve any statements or representations by either of the defendants, but rather, is effectively a claim that defendants did not pay benefits which, in plaintiffs' opinions, should have been paid. The court has determined that there exists a question of fact as to whether the damage to plaintiffs' homes qualifies as a "major construction defect" such that

**20.** The court is aware of plaintiffs' contention that they may support their fraud claims without necessarily proving each of the delineated elements by proving the fraud constructively. A constructive fraud theory has been recognized as a method of establishing liability for the making of statements which are opinionative in nature and generally not actionable. *See Ryan v. Glenn*, 344 F.Supp. 198, 201 (N.D.Miss.1972). In such cases, opinionative statements may amount to fraud where there is a confidential relation between the parties, where the facts are not equally known to both of them and where fair investigation is prevented. *Id.* The doctrine has no application in the case at bar. This case does not concern statements of opinion but

rather of facts as to coverage. In addition, there was no confidential relation between the parties and plaintiffs were not deprived of the ability to read the relevant documents and determine for themselves the nature and scope of coverage.

**21.** *See supra* note 18.

**22.** The court would note that defendant HOW was not involved in the claims-handling process or in the development of procedures for claims and could incur no liability in this regard in any event. CIGNA, as stated, has no liability since there is no factual basis for the allegation.

benefits are due and payable; hence, liability or nonliability for the claims is not clear.

Only the Yeomans submitted any claims to arbitration and with reference to them, the court has concluded that they have not been damaged as a result of their decision to arbitrate. Thus, no. (5) provides no avenue of recovery. Allegation no. (6), like most of the others, does not concern any representations of any sort by either defendant, nor does it state in what respect or respects plaintiffs, or other homeowners, were treated "unfairly" or "dishonestly." It is thus much too general to stand as an allegation of fraud, or of any cause of action. Number (7) appears to be nothing more than a restatement of what is contained in no. (6), and like no. (6), is insufficient to state a claim for any sort of relief. The effect of any representations concerning arbitration, as previously stated, relates only to the Yeomans and does not state a claim due to the lack of any damage to the Yeomans. Thus, no. (8), like no. (5) addressed above, provides no basis for relief.

As with many of their other allegations, plaintiffs have not stated in their claim no. (9) the manner in which defendants are claimed to have "intended to injure" homeowners or "knowingly create[d] a risk of harm" or the type of harm to which plaintiffs and other homeowners are alleged to have been subjected. Moreover, in no event could it be said that this allegation represents an allegation of fraud; as with virtually all of their allegations in count XII, this count involves no statements or representations of any kind by defendants. Number (10) of the allegations under consideration, charging that defendants unreasonably breached the justifiable expectations of their insureds, is not a claim of fraud but rather is, for all practical purposes, nothing more than an allegation that defendants breached the insurance contract by failing to pay policy benefits as expect-

ed by plaintiffs. This allegation is, therefore, superfluous inasmuch as the basis underlying these lawsuits is the failure to pay benefits which plaintiffs claim are due. The court has held, above, that there was no implied covenant of good faith and fair dealing in the insurance contract at issue in this case. Thus, allegation no. (11), which again, does not charge fraud but merely the breach of that nonexistent duty, fails as a matter of law.

Number (12) of plaintiffs' allegations does indeed charge fraud by defendants; that is, it charges that defedants misrepresented that the major construction defect insurance would provide protection in the event their homes suffered foundation damage as a result of soil movement. As to this charge, it appears to be plaintiffs' position that representations were made to plaintiffs that *any* damage to their homes as a result of soil movement would be covered under the policy, and in particular, under the policy definition of "major construction defect." As expressed previously in this opinion, none of the brochures and literature provided by defendants to plaintiffs represented that coverage extended beyond what was actually provided in the policy itself. Other than those materials, the only evidence presented by plaintiffs regarding an alleged misrepresentation as to the types and scope of coverage available under the HOW program is the affidavit of Don Agent, an individual who was previously in charge of HOW's local council. Agent's affidavit states, "The only other information given to the home builders was for them to tell the prospective homeowners that if any damage resulted to the home as a result of defects in the construction, then HOW would cover it or repair it." After the affidavit was signed by Mr. Agent, he gave his sworn statement in which he disavowed many of the statements contained in the affidavit[23] and explained, regarding that statement, as follows:

**23.** In the sworn statement, Mr. Agent explained that the affidavit was drafted exclusively by counsel for plaintiffs. When presented to him for his signature, Mr. Agent was in his truck on the way out of town, was in a hurry and reviewed the affidavit only cursorily for about one

minute. He expressed in his sworn statement that numerous of the statements in the affidavit were taken out of context and he either disavowed those statements or placed them in the perspective in which they were intended.

Q. ... I want to focus in on the word "any" and ask you whether you agree or disagree with this language. Is it true that if any damage resulted, then HOW would cover it?

A. No.

Q. And homebuilders were given documents which would accurately explain what the warranty would cover and would not cover?

A. Exactly.

Q. Do you know of any misrepresentations ... between the brochures or the seminars that you held or the training sessions that you held, and then what the actual warranty would say?

A. Not in Mississippi.

Mr. Agent further stated that he "never" made any blanket promises that HOW would cover everything, that he did not lead builders to believe that the coverage warranted the home against any and all structural defects, and that he never encouraged builders to promise the buyer that HOW would repair all problems. The proof in this case is thus to the effect that information concerning the HOW program and the coverage provided under that program was provided to builders who, in turn, provided the information to home buyers, including plaintiffs. The information given builders was accurate and was not misleading.[24] The plaintiff homeowners never had any direct contact with anyone from HOW or from CIGNA before becoming enrolled in the HOW program but relied on the information furnished by their builders, including the HOW and CIGNA literature. Hence, the only representations to plaintiffs were contained in the literature, which was accurate, and from the builders, who were properly instructed by HOW regarding the scope of coverage that was available. Under the clear facts, therefore, plaintiffs have presented no evidence upon which the trier of fact could find that there were any actionable misrepresentations by HOW or by CIGNA.

**24.** CIGNA made no representations to the builders and in fact had no responsibility as to the recruitment or training of builders.

Allegation no. (13), charging that defendants continued in a "course of conduct of tortious bad faith in utilizing 'economic coercion' against its insureds," is not a charge of fraud, but rather appears to be more appropriately considered as a component of plaintiffs' more general assertion of bad faith refusal to pay insurance benefits. That count of the complaint charging bad faith is addressed elsewhere and need not be considered here.

The last of the instances of "fraud" charged by plaintiffs, nos. (14), (15) and (16), all appear to concern an alleged conspiracy by defendants to, as a general business practice, deny claims in the Jackson area, unfairly and dishonestly, and without any legitimate or arguable reason. A concise statement of plaintiffs' position in this regard is as follows: Defendants, bent on realizing profits from their enterprise, sacrificed the rights of homeowners covered under the HOW program by engaging in a course of conduct of intentionally denying legitimate covered claims without any legitimate or arguable reason. In support of this theory, plaintiffs assert, in a conclusory fashion, that there existed both actual agreements and conspiratorial conduct between the defendants upon which liability may be predicated. Again, however, they fail to elucidate the nature of the agreements or the "conspiratorial" conduct.

Regarding the allegations of conspiracy, the only "actual agreement" that appears to be relied on by plaintiffs to establish the existence of a common plan to unjustifiably deny claims is the contract between HOW and CIGNA wherein it was agreed that in the event of high losses, CIGNA could increase HOW's premium and conversely, in the event that losses were less than anticipated, CIGNA could decrease the premium charged HOW. Under that arrangement, if CIGNA increased the premium rate charge, then HOW would share in the claims losses; if CIGNA decreased the premium, HOW would share in the premium profits realized from the HOW program.

Plaintiffs reason, therefore, that both entities were motivated to reduce claims losses and, to effectuate that goal, engaged in an overall scheme to deny claims wrongfully. Defendants do not claim that altruism motivated their participation in the HOW program and that surely is not the case. But the mere fact that the defendants were in business to generate a profit and that both defendants would have experienced greater profits if claims losses were reduced is, in itself, obviously insufficient to provide the basis for liability. Only if the defendants, in pursuit of those profits, breached their obligations to the homeowners in the program could there be a finding of any liability. And to support their claims of conspiracy, plaintiffs must demonstrate that the defendants acted in concert, pursuant to an agreement, explicit or implicit, to breach their obligations. There is absolutely no proof of such an agreement. Consequently, plaintiffs claims fail.[25]

## EXTRACONTRACTUAL DAMAGES

To date, the courts of Mississippi have not permitted an award of extracontractual damages for breach of an insurance contract in the absence of a showing of bad faith refusal to pay benefits. *See Blue Cross & Blue Shield of Miss., Inc. v. Maas*, 516 So.2d 495 (Miss.1988); *Eichenseer v. Reserve Life Ins. Co.*, 682 F.Supp. 1355 (N.D.Miss.1988); *Aetna Cas. & Sur. Co. v. Day*, 487 So.2d 830 (Miss.1986). Plaintiffs assert that they may recover extracontractual compensatory damages even in the absence of bad faith since the defendants could reasonably have foreseen, at the time of contracting, that such damages, as for emotional distress, would flow from their breach of contract. In *Aetna Cas. & Surety Co. v. Day*, 487 So.2d 830 (Miss. 1986), the court stated that where an insurance company breaches its insurance contract, "the insured may recover from the insurer any losses proximately resulting from the breach and which the parties at the time of contracting had reason to foresee as a probable result of that breach. Such damages must be measurable in mon-

etary terms and must be reasonably certain." *Day*, 487 So.2d at 835 (citing *Wright v. Stevens*, 445 So.2d 791, 798 (Miss.1984)). The emotional distress-type damages sought by plaintiffs do not qualify. The court holds that such damages, as a matter of law, are not reasonably foreseeable, nor are they reasonably certain.

## CONCLUSION

It can be fairly said that plaintiffs brought their lawsuits attempting to base causes of action upon contentions that defendants drew a narrow definition of coverage and failed to underwrite the HOW program properly. With the sole exception of plaintiffs' claims for policy benefits, however, the causes of action alleged are either without basis in law or unsupported by the facts. Accordingly, it is ordered that HOW's motion for summary judgment is granted and CIGNA's motion for partial summary judgment and partial judgment on the pleadings is granted.

SO ORDERED.

---

**25.** Plaintiffs actually propose to establish the existence of an implicit agreement by evidence of a course of conduct by defendants in the denial of claims of insureds in the Jackson area. That evidence has been found by the court to be inadmissible.